## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

Joshua Barrett Shapiro,

    Plaintiff,

                                  CASE NO.  CA 11-140 ML
                            **(Jury Demand Endorsed Hereon)**

v.

Roger Williams University, et al,

    Defendants.

## FIRST AMENDED COMPLAINT

### I. PRELIMINARY STATEMENT

1.  The Plaintiff commences this action against Roger Williams University (said Roger Williams University being hereafter called "RWU") and its officials alleging, (i) breach of contract, (ii) breach of covenant of good faith and fair dealing, (iii) fraud, (iv) deceit, (v) negligent misrepresentation, and (vi) punitive damages.  The Plaintiff intends to prove that defendants through their position as University officials have circumvented Rhode Island state law by knowingly and intentionally taking disciplinary action against the Plaintiff. Defendants have failed to provide notice or enforce proper procedures before expelling the Plaintiff from RWU.  The Plaintiff's factual allegations section of his complaint states that he "is a victim

of travesty of justice, deliberate injustice knowingly committed by co-defendant, President, Roy J. Nirschel and the other named defendants, and such gross injustice was committed with wanton, malice and fraud, all of which will pierce the University veil and hold defendants accountable as any other citizen who violated the law of the land." The Plaintiff characterizes co-defendant, President, Roy J. Nirschel actions in this case as a "University dictatorship and University tyranny," co-defendant, President, Roy J. Nirschel has inappropriately denied the Plaintiff's pleadings that he filed with the University, and has "acted in a manner [of] conduct unbecoming of a University officer."

2. Defendants in this case have concerted as well as have acted personally, intentionally, and knowingly in violating Rhode Island law. The Plaintiff claims all defendants are liable for their actions which the Plaintiff is seeking a declaratory judgment, monetary relief including punitive damages as well as prospective injunctive relief restraining defendants from enforcing disciplinary sanctions against the Plaintiff's academic transcript and disciplinary record.

## II.   PARTIES

3.  The Plaintiff was a former student of Roger Williams University enrolled in the College of Arts and Sciences in the Criminal Justice degree program.  During such time the Plaintiff participated in many student community organizations including the 'Hillel' and 'political science' clubs as well as traveled domestically and internationally with other University students in affiliation with the respective RWU clubs.  Moreover, the Plaintiff competed as a collegiate athlete on the RWU cross country and track and field teams.  The Plaintiff claims he was expelled from RWU in beginning of the fall term of 2001 due to defendants committing, (i) breach of contract, (ii) breach of covenant of good faith and fair dealing, (iii) fraud, (iv) deceit, (v) negligent misrepresentation, and (vi) punitive damages against the Plaintiff.

4.  Co-defendant, RWU is a private university and is a party to this action.  RWU is liable for committing (i) breach of contract, (ii) breach of covenant of good faith and fair dealing, (iii) fraud, (iv) deceit, (v) negligent misrepresentation, and (vi) punitive damages against the Plaintiff.  The Plaintiff will be seeking a declaratory judgment, monetary relief including punitive damages and prospective injunctive relief against RWU.

5.  Co-defendant, President, Roy J. Nirschel is a co-defendant to this action because of his personal involvement, awareness, and notification during and subsequent to the Plaintiff being expelled and removed from RWU.  The Plaintiff contends co-defendant, President, Roy J. Nirschel acted personally in having the Plaintiff removed from RWU and failed to reconcile or aid in reaching resolution.  Given co-defendant, President, Roy J. Nirschel's recalcitrant effort to ensure the Plaintiff received a fair and impartial hearing as promulgated in the RWU student handbook to dispute any allegations made by University officials or others, created an illusory contractual relationship as well as fraud, deceit, and negligent misrepresentation. The Plaintiff will be seeking a declaratory judgment, monetary relief including punitive damages and prospective injunctive relief against co-defendant, President, Roy J. Nirschel.

6.  Co-defendant, Former Dean of Student Affairs, Richard Stegman is a party to this action because he executed the order to have the Plaintiff disciplinary expelled without affording the Plaintiff a hearing or fair notice of any University code violations or charges against him. Defendant has further become a party to this suit because it is beyond reasonable dispute that co-defendant, Richard Stegman has

acted out of personal motivation and has used his Student Affairs

office as an offensive weapon to vindicate personal objectives, and it

further appears certain that no party has invoked the administrative

machinery for any purpose at all, and the Plaintiff asserts his actions

do not amount to compliance with University policies and procedures.

Moreover, he acted with the various co-defendants to expedite the

Plaintiff's expulsion and removal from the University.  The Plaintiff will

be seeking a declaratory judgment, monetary relief including punitive

damages as well as prospective injunctive relief against co-

defendant, former Dean of Student Affairs, Richard Stegman.

7.  Co-defendant, Director of Student Conduct and Community

Standards, Heidi Hartzell is a party to this action because she

concerted with co-defendant, former Dean of Student Affairs, Richard

Stegman and was personally involved in the expulsion of the Plaintiff

from RWU.  The Plaintiff spoke directly with co-defendant, Heidi

Hartzell who refused to consider the Plaintiff's side of the story.

Moreover, subsequent to the Plaintiff being removed from RWU he

repeatedly attempted to resolve the matter by seeking to reach co-

defendant, Heidi Hartzell, though she declined to respond.  The

Plaintiff's telephone calls and messages eventually went unreturned

despite assurances by her office that all the Plaintiff's messages were being given to co-defendant, Heidi Hartzell. The Plaintiff's family spoke directly with co-defendant, Heidi Hartzell though she refused to want to reach resolution. The Plaintiff will be seeking a declaratory judgment, monetary relief including punitive damages as well as prospective injunctive relief against co-defendant, Director of Student Conduct and Community Standards, Heidi Hartzell.

8. Co-defendant, Associate Dean of Student Affairs, Allison Chase-Padula is a party to this action because of her personal actions and involvement with co-defendant, former Dean of Student Affairs, Richard Stegman for the expulsion and removal of the Plaintiff from RWU. The Plaintiff spoke directly with co-defendant, Allison Chase-Padula regarding problems the Plaintiff was having on the RWU campus though she declined to resolve or take action to correct any of the Plaintiff's problems. In fact, she supported that the Plaintiff be expelled from RWU. Given co-defendant, Associate Dean of Student Affairs, Allison Chase-Padula's position as 'Associate Dean,' she assumed the authority and power to act as a 'Dean' in making decisions on behalf of co-defendant, Richard Stegman as well as acting in his place in his absence which included in aiding and

facilitating the expulsion of the Plaintiff from RWU.  The Plaintiff will

be seeking a declaratory judgment, monetary relief including punitive

damages as well as prospective injunctive relief against Associate

Dean of Student Affairs, Allison Chase-Padula.

9.  Co-defendant, Director of Housing, Tony Montefusco is a party to

this action for deliberating taking action to see that the Plaintiff would

be removed from RWU.  Co-defendant, Director of Housing, Tony

Montefusco was directly responsible for the housing and resident life

of the students at RWU.  The Plaintiff spoke with defendant on

multiple occasions regarding ongoing housing problems.  These

problems continued on the University campus and the Plaintiff

asserts defendant shifted the blame onto the Plaintiff and with the

support of co-defendant, Richard Stegman, he was able to agree to

have the Plaintiff expelled from RWU without proper notice or

hearing.  Numerous arguments ensued between co-defendant, Tony

Montefusco and the Plaintiff regarding the Plaintiff's experience while

at RWU.  The Plaintiff complained that his dorm was noisy, loud,

students drinking alcohol including RA's, underage drinking, smoking,

and drugs.  Defendant contacted the Plaintiff's family and created

conflicts and arguments regarding the Plaintiff.  Assurances that the

Plaintiff was not a problem at the University created more confusion between the Plaintiff and defendant and matters continued to exacerbate. The Plaintiff will be seeking a declaratory judgment, monetary relief including punitive damages as well as prospective injunctive relief against co-defendant, Director of Housing, Tony Montefusco.

10.  Co-defendant, former Dean, Anthony Pesare was the head of Criminal Justice department at RWU as well as the Plaintiff's academic advisor.  Co-defendant, Anthony Pesare is a party to this action because of his personal actions and direct involvement with co-defendant, Richard Stegman in having the Plaintiff expelled and removed from RWU.  The Plaintiff and co-defendant, Anthony Pesare frequently communicated contemporaneous of the time period the Plaintiff attended RWU.  During such time the Plaintiff continually informed co-defendant, Anthony Pesare of his ongoing problems with RWU campus life concerning his dormitory situation and among other issues.  Co-defendant, Anthony Pesare was aware of the Plaintiff's issues which interfered with the Plaintiff's educational experience as well as his overall living experience.  Defendant was neither amicable or congenial with the Plaintiff when he complained and many of these

problems continued to exacerbate.  These arguments between the

Plaintiff and defendant became emotional and resulted in frequent

quarrelsome disputes.  The Plaintiff will be a seeking declaratory

judgment, monetary relief including punitive damages as well as

prospective injunctive relief against co-defendant, Former Dean,

Anthony Pesare.

11.  Any reference or language expressed in the complaint invoking

the word 'defendants,' or 'Defendants' shall be construed to

encompass the actions of all defendants named in the Plaintiff's first

amended complaint.

### III.  JURISDICITON AND VENUE

12.  This Court's jurisdiction is invoked pursuant to, 28 U.S.C.A. §

1332 and § 1441, (Diversity of citizenship; amount in controversy;

costs).  Venue is proper in this District because the parties are

domiciled in different states respectively, Plaintiff, California and

defendants, Rhode Island.  Bristol, Rhode Island is the location and

place of State by which defendants have been incorporated and of

the State where it has its principal place of business, and is the situs

of the acts complained of herein.  The amount in controversy,

exclusive of costs and fees being sought by the Plaintiff is for

$2,000,000.00.  Thus, the amount of in controversy and parties diversity citizenship satisfies the requirement under § 1332.

## IV.  FACTUAL ALLEGATIONS

13.  The Plaintiff was a former student of Roger Williams University, from the summer term of 1999 until the beginning of the fall term of 2001.  During such time the Plaintiff was enrolled in the Criminal Justice program under the supervision of co-defendant, Anthony Pesare.  The Plaintiff was a full-time student as well as a member of the University's Hillel and political science clubs.  The Plaintiff competed as a collegiate athlete on the cross country and track and field teams.

14.  The Plaintiff was 18 years of age when he began at RWU and was financially dependant on his parents while a student at RWU.

15.  While the Plaintiff was a student at RWU he lived in the campus dormitories.  During such time he experienced quite a number of incidents with other students which created tension on the RWU campus.

16.  The Plaintiff contends he was expelled and thrown out RWU because of the actions of defendants which violated Rhode Island law.

17.  The Plaintiff and his family has sought to discover information as to why he was expelled from the RWU subsequent to being removed from the University though defendants have failed to provide information or documentation, claiming it is confidential and can not be released.

18.  The Plaintiff on two other separate occasions subsequent to being expelled was required to acquire information from RWU concerning why he was expelled.  Once was in 2003 when the Plaintiff made application to Old Dominion University.  In addition, Old Dominion University requested information from RWU as to why the Plaintiff was expelled *ie* the circumstances surrounding his situation and disciplinary action taken.  RWU refused to provide the Plaintiff or Old Dominion University any information or documentation, claiming it was confidential and could not be released.

19.  Subsequent to, graduating from Old Dominion University the Plaintiff applied to Abraham Lincoln University School of Law where he was informed and required to request from RWU why he was expelled.  RWU again refused to provide information or documentation, claiming it was confidential and can not be released.

20.  All requests attempted to obtain why the Plaintiff was expelled from the RWU were properly addressed in writing as well as over the phone.  RWU clearly enunciates in its publications that they follow the Family Educational Rights and Privacy Act (FERPA).  Yet, the Plaintiff, his family, and two other educational institutions have attempted by following the rules under (FERPA) in obtaining the Plaintiff's records *ie* disciplinary action, charge statement, or formal hearing and have been unsuccessful.

21.  Moreover, RWU expelled the Plaintiff claiming he owed in excess of $30,000 in tuition for less than six weeks of attending the beginning of his third year at RWU.

22.  Subsequent to, the Plaintiff's expulsion the debt was discharged and had been eliminated in a chapter 7 bankruptcy petition.  Yet, the Plaintiff still to this day has unsuccessful in obtaining any records from RWU other than his academic transcript.

23.  The Plaintiff intends to prove that defendants are the subterfuge, concealment, and/or obfuscation for involvement with the University.

24.  RWU prepares and distributes to those who enroll a student handbook.  The Plaintiff claims he received a student handbook as did all students that attended RWU.  With respect to matters of

student conduct, the handbook designates the rudimentary contractual terms between the parties.

25.  The RWU student handbook provides conduct procedures for violations of University code.  It is clear that a student will receive notice with an explanation of the incident and an explanation of the specific charge statement.  This will serve as formal notification of the charges, and will outline various resolution options, and the student's procedural rights.

26.  The Plaintiff contends that he never received an explanation of any incident or explanation of the specific charge statement or any opportunity to voice his side of the story.

27.  Each student at RWU is entitled to a Disciplinary Meeting where the student will be encouraged to discuss and review the charges being brought against him or her.  The student may ask questions regarding the charges, the conduct process as well as the possible outcomes of the meeting.  During the Disciplinary Meeting, the student charged will have the right to choose between the following options (with the consensus of the Office of Student Conduct and Community Standards):

A.  Accepting responsibility for his/her actions, and verifying that the charges issued against him/her are correct.  If this option is chosen, the student requests that the situation be resolved through an Administrative Meeting.  (See: *Decision Making Bodies Regarding Student Conduct.*); or,

B.  Deny responsibility for the charges, and request an administrative hearing officer to review the case or complete an Administrative Meeting at that time.  (See: *Decision Making Bodies Regarding Student Conduct.*); or,

C.  If the outcome of the alleged violation could result in a sanction of suspension or expulsion from the University, the Office of Student Conduct and Community Standards shall prepare and present to the accused a written notice of the charges and may give the student the option of selecting, with the consensus of the Office of Student Conduct and Community Standards, their case being heard by:

1.  University Disciplinary Committee (UDC)

2.  University Hearing (UH)

At times the University may select not to give the student an option and send the case to either a UDC or UH.  The notification will be

given at least two calendar days prior to the hearing.  (See: *Decision Making Bodies Regarding Student Conduct.*);

D.  Additionally, in a case of alleged violation of the Conduct Code, the Vice President of Student Affairs or his or her designee may remove a case from the University's conduct system, whenever, in his or her discretion, such removal is believed to be in the best interest of the accused student or the University community.  In the event of such removal, he or she shall have the sole and unreviewable discretion to conduct hearings, if any, upon notice, and impose such sanctions deemed appropriate.

28.  The Plaintiff claims the record is clear that defendants failed to ensure the Plaintiff received a formal hearing, notice/parental notice of any code violations, complaint, or documentation concerning his expulsion from RWU including notice to his parents whom the Plaintiff was financially dependant on.  Therefore, the Plaintiff was precluded from asserting his right to appeal any decision of RWU that he may have been dissatisfied about.

29.  Moreover, the Student Handbook acknowledges that most students are financially dependant on their parents and RWU would notify parents in the event of any code violations.  The Plaintiff

contends his family was never contacted regarding him being expelled or removed from RWU.

30. The Plaintiff often complained to co-defendants, Roger Williams University; Former Dean of the Department of Criminal Justice, Anthony Pesare; President, Roy J. Nirschel; Director of Housing, Tony Montefusco; Director of Student Conduct, and Community Standards, Heidi Hartzell; Associate Dean of Student Affairs, Allison Chase-Padula; and Former Dean of Student Affairs, Richard Stegman.  Unfortunately, defendants did not take RWU student campus life seriously.  Defendants in fact, condoned such behavior including marijuana smoking, drugs, drinking, and violence.

31. The Plaintiff claims that each defendant personally participated and contributed to the Plaintiff's removal from RWU.

32. In and prior to the fall term of 2001, co-defendant, Tony Montefusco threatened the Plaintiff that he was going to be kicked out of RWU if he did not stop complaining.  Co-defendant, Tony Montefusco stated he had the support of co-defendant, Richard Stegman and suggested that the Plaintiff should speak with co-defendant, Richard Stegman if he felt he needed to.

33.  Co-defendant, Tony Montefusco utilized the support of co-defendant, Richard Stegman and refused to take any proactive assistance to assist the Plaintiff with any housing issues or problems he was facing *ie* hate crimes, noise disturbances, smoking, drinking, under age drinking, drugs.  Instead the Plaintiff was forced to relocate from one housing unit to another and was forced to pay out of pocket expenses to cover the higher cost of living and eventually his housing status terminated in the fall term of 2001 without any notification from co-defendant, Tony Montefusco.

34.  When the Plaintiff was kick out of RWU co-defendant, Tony Montefusco refused to assist or aid in recovering housing expenses or ensuring that the Plaintiff could continue living at RWU.  The Plaintiff asserts he was never notified of any charges of University violations with his housing experience and had satisfied the terms and conditions to live in the RWU campus dormitories and housing units.

35.  The terms of conditions found in the RWU housing contract provided students including the Plaintiff notice of any violations/charge statement outlining any violations, a hearing to dispute any allegations, notice to family members when a student

was financially dependant on their family, and a right to appeal an improper sanction.

36. The Plaintiff contends he never received any notice or charge statement from co-defendant, Tony Montefusco referencing the Plaintiff's termination from RWU student housing.  Moreover, the Plaintiff's family never was notified either.

37. The Plaintiff asserts he satisfied payment to live in all RWU housing units and was current on all his expenses owed to RWU.

38. The Plaintiff spoke directly with co-defendant, Director of Student Conduct and Community Standards, Heidi Hartzell who refused to consider the Plaintiff's side of story when he complained about problems he was experiencing on the RWU campus as described in the complaint.  Co-defendant, Director of Student Conduct and Community Standards, Heidi Hartzell had the support of co-defendant, Former Dean of Student Affairs, Richard Stegman who provided her with the authority to remove the Plaintiff from RWU.  Co-defendant, Director of Student Conduct and Community Standards, Heidi Hartzell claimed she had a much different story than what the Plaintiff was arguing and refused to believe any part of what the Plaintiff was upset over.  Co-defendant, Heidi Hartzell told the Plaintiff

'if [you] do not watch it, [your] going to be thrown out of here and there will be nothing that you will be able to do about it!'  Moreover, Ms. Hartzell condoned University problems that the Plaintiff complained to her about which encompassed noise disturbances, alcohol abuse including underage drinking, drugs, and smoking in the residence halls.  The Plaintiff even brought to her attention how resident assistants ("RA's") would often engage in these activities and campus public safety really stayed away from these problems.  The Plaintiff was not alone either in this situation because other students complained as well to her.

39.  Additionally, subsequent to the Plaintiff being expelled from RWU he corresponded with co-defendant, Heidi Hartzell by telephone to reach resolution though she failed to respond.  The Plaintiff's telephone calls and messages eventually went unreturned.

40.  The Plaintiff was in direct contact with co-defendant, Associate Dean of Student Affairs, Allison Chase-Padula who claimed she was aware of the Plaintiff's communications with co-defendant, Director of Student Conduct and Community Standards, Heidi Hartzell.  Co-defendant, Allison Chase-Padula asserted she would not undermine co-defendant, Heidi Hartzell or co-defendant, Former Dean of

Student Affairs, Richard Stegman's decision to have the Plaintiff released from RWU.  Co-defendant, Allison Chase-Padula made no effort to resolve the Plaintiff's complaints regarding the University campus and instead stood behind the decisions of her superiors. She supported the decision that the Plaintiff should be expelled from RWU and pacified the Plaintiff by asserting that a formal hearing would be unnecessary to have.  Moreover, co-defendant, Allison Chase-Padula condoned University problems that the Plaintiff complained to her about which encompassed noise disturbances, alcohol abuse including underage drinking, drugs, and smoking in the residence halls.

41.  Co-defendant, Associate Dean of Student Affairs, Allison Chase-Padula assumed the responsibilities and duties that were ordinarily executed or performed by co-defendant, former Dean of Students, Richard Stegman.  The two defendants frequently communicated on a variety of issues though when co-defendant, former Dean of Students, Richard Stegman got tired of hearing the Plaintiff complain he had co-defendant, Associate Dean of Student Affairs, Allison Chase-Padula and co-defendant, Heidi Hartzell expedite the Plaintiff's expulsion from RWU.

42. In the fall term of 2001, the Plaintiff recalls getting into an argument with co-defendant, Anthony Pesare not long before he was removed from RWU.  Co-defendant, Anthony Pesare began yelling and using expletive remarks at the Plaintiff in his office and told him to, "Get the Fuck out and I do not want to see you here again!  If you don't like it here then you can leave!"  Co-defendant, Anthony Pesare called campus public safety and had the Plaintiff removed from his office.

43. This was not the first or only dispute the Plaintiff had with co-defendant, Anthony Pesare.  Apart from this experience the Plaintiff routinely informed co-defendant, Anthony Pesare regarding his experience while at RWU.  The Plaintiff's complaints he directed to co-defendant, Anthony Pesare are consistent with the facts described in the complaint.

44. It appeared from a conversation that the Plaintiff had with co-defendant, Richard Stegman that co-defendant, Anthony Pesare had complained about the Plaintiff's decorum in his office.  Co-defendant, Richard Stegman influenced by co-defendant, Anthony Pesare's complaint concerning the Plaintiff decided that disciplinary action would be necessary.

45.  The Plaintiff denied responsibility and asserted his legal rights as

a student.  Co-defendant, Richard Stegman claimed the Plaintiff had

no rights and did not care who the Plaintiff's father was.  The Plaintiff

further enunciated his loathe and wrath towards co-defendant,

Richard Stegman arguing that since the Plaintiff had been at RWU

his complaints had gone unresolved and the Plaintiff was clearly not

the only victim among students who attended RWU.

46.  Co-defendant, Richard Stegman introduced the Plaintiff to co-

defendant, Director of Student Conduct, and Community Standards,

Heidi Hartzell and Associate Dean of Student Affairs, Allison Chase-

Padula who he claimed would further handle the Plaintiff's problems.

The Plaintiff had already known these individuals from prior

conversations he had with them concerning his experience while at

RWU.

47.  In fall term of 2001 the Plaintiff got into another argument with

co-defendant, Richard Stegman regarding University campus life and

issues with living on the University campus.  Co-defendant, Richard

Stegman told the Plaintiff if '[he] did not like it here he did not have to

stay, [you] could leave.'  Co-defendant, Richard Stegman further

understood that the Plaintiff's father was an attorney, but asserted he

or his staff did not have to inform the Plaintiff's parents of anything and the Plaintiff was an adult now and he could get rid of the Plaintiff at anytime.  The Plaintiff argued that he had paid to be at RWU and felt that co-defendant, Richard Stegman was really sitting still while problems continued to exacerbate.  Moreover, co-defendant, Richard Stegman threatened the Plaintiff on more than one occasion that he was going to throw the Plaintiff out if he continued down the path he was going.  When the Plaintiff sought to discover the reasons why he was being expelled or whether he was going to receive a hearing to be able to dispute his expulsion, co-defendant, Richard Stegman refused.  Co-defendant, Richard Stegman appeared as though he had just about enough of the Plaintiff.  Through contacting defendants the Plaintiff discovered that co-defendant, Richard Stegman decided action was warranted that the Plaintiff not be allowed to return to RWU ever again.

48.  The Plaintiff eventually considered an opportunity to speak with co-defendant, President, Roy J. Nirschel would be most appropriate to direct his problems with regarding his experience while at RWU. The Plaintiff attempted to discuss his problems he was facing with co-defendant, President, Roy J. Nirschel by going in person to arrange

to make a meeting with the President though he never made himself available to speak directly with.  Instead the Plaintiff corresponded in writing the problems he was having.  As evidenced in the complaint the Plaintiff addressed all the problems he was having at RWU to co-defendant, President, Roy J. Nirschel though he never responded.

49.  The Plaintiff's family as well contacted co-defendant, President, Roy J. Nirschel subsequent to the Plaintiff being removed from RWU though co-defendant, President, Roy J. Nirschel refused to want reconcile.

50.  Co-defendant, Former Dean, Anthony Pesare aware of the Plaintiff's disgust regarding the University and its problems decided to take the law into his own hands by taking disciplinary action of having campus public safety remove the Plaintiff in an expeditious manner without a formal hearing, notice, opportunity to confront co-defendant, Former Dean, Anthony Pesare, or allow the Plaintiff to bring private counsel to resolve any University problems.

51.  Public Safety came and told the Plaintiff that he needed to gather his personal belongings.  The Plaintiff was taken by public safety and dropped off a couple of miles down the road from RWU campus.

52.  The Plaintiff's father, Mitchell Shapiro an attorney from California routinely spoke with co-defendant, Anthony Pesare regarding the Plaintiff and how he was doing.  In fact, the Plaintiff's father had sought to have counsel come to resolve this matter after discovering the Plaintiff had been expelled and removed from the RWU. Defendants did not agree that this would be possible and refused to settle amicably or congenially.

53.  The Plaintiff asserts that the disciplinary action taken by defendants was intemperate and impatience shown by the defendants actions seemed to be very eager to dispose [of] this particular student very quickly raises questions as to the partiality, bias, [and] prejudice this University seems [to have] already developed against the Plaintiff.  It is remarkable that the speed at which the University had acted in dismissing the Plaintiff for the frivolous 'alleged reasons' of failure to respect co-defendant, former Dean Pesare and University staff and how remarkable the University 'singled out' this particular Plaintiff to cause him harm by dismissing him from the University, shows that this University was very anxious to get rid of this student for whatever reasons and whatever communications the University may be having with other parties

including defendants.  It is further phenomenal that when the
University has so many other pressing issues and loads of students,
it seems this University was waiting like a hawk for the Plaintiff to be
thrown out and in spite of the Plaintiff filing the proper process laid out
by RWU and Rhode Island Statutes to ensure his rights would not be
violated, proceeded with dismissing the Plaintiff anyway.

54.  The Plaintiff suffered as a result of the actions of defendants
which had caused the Plaintiff, to worry constantly, was unable to
sleep, had trouble concentrating and "had a real distrust of the
defendants."  The Plaintiff asserts the whole experience has shaken
his confidence in himself and has really affected his self-esteem.

55.  The Plaintiff was overwhelmed by not being able to figure out
what to do, and although he couldn't trust anything that the
defendants at the University said, he was reluctant to give up the
dream of becoming a lawyer.  He lost confidence and trust in
defendants, RWU, and in the administrators of the University
because he had just been lied to too many times.

56.  Subsequent to, being forcibly removed from the University
campus the Plaintiff's family contacted all defendants though were
non responsive with the exception of co-defendant, Heidi Hartzell

who the Plaintiff's family spoke to though she refused to seek resolution claiming she had the support of co-defendant, Richard Stegman. The Plaintiff was financially dependant on his parents who were never made aware of the situation or reasons the Plaintiff was being expelled.

57. Furthermore, the University focused on only two of the school's requirements for admission/retention — academic performance and payment of tuition — and ignored the school's conduct and disciplinary requirements. A school's code of conduct is not superfluous to its proper operation; it is an integral aspect of a productive learning environment.

58. The Plaintiff experienced mental pain, anguish, and embarrassment as a result of defendants actions and his road to recovery has been difficult. The effect of the combined conduct of defendants has created a situation in which this court cannot 'unring the bell.'

59. Interestingly, this does not appear to be the first or only time the defendants involved in this scheme have used the same tactics to their advantage. Indeed, apart from these matters, the Plaintiff has located and corresponded with over a dozen individuals whose lives

were affected and often nearly obliterated by the actions of

defendants involved in this case, who sought the same ends through

much the same means as applied in this scheme.

60.  While these defendants, oblivious to the Plaintiff's concerns or

issues while at RWU and the rights of the Plaintiff, ostentatiously

furthers the scheme while bulling the Plaintiff.  Defendants expelled

and had the Plaintiff removed from RWU within six weeks of the fall

term of 2001 leaving the Plaintiff to incur a debt exceeding $30,000

claimed to be owed to RWU.  For the fall term of 2001, the Plaintiff

satisfied payment for his campus living expenses including his

housing and his meal plan which included for 19 meals a week which

defendants never reimbursed the Plaintiff for.  The Plaintiff had

completed two and half years before being expelled and was current

on all tuition and expenses with RWU.

**ARGUMENT**

## V.  BREACH OF CONTRACT  (COUNT I)

61.  The Plaintiff first alleges that defendants did not, among other things, provide the Plaintiff with an educational atmosphere that was responsive to individual needs and is in breach of contract because it did not provide the Plaintiff with adequate educational accommodations, services including any disciplinary hearing or notice of any impending or pending charges, student code violations, or problems.  Moreover, the Plaintiff asserts he was financially dependant on his parents while attending RWU and his parents were never notified of the Plaintiff being expelled, any charges against him, or student code violations.

62.  Nevertheless, the University through a student handbook and other related materials made specific promises that the Plaintiff would be entitled to certain specific services and accommodations to him *ie* formal hearing, parental notice of any code violations, documentation concerning his removal including notice to his parents whom the Plaintiff was financially dependant upon as well as a right to appeal any decision of RWU that he may have been dissatisfied about.  Moreover, the Plaintiff alleges that RWU breached its promise by

reneging on its commitment to provide those services,

accommodations, and, consequently, effectively cutting him off from

any participation in and benefit from the University.

63. The Plaintiff asserts RWU is a private university and the Plaintiff

shared a contractual relationship with each of the defendants. This

contract is conceived of as one by which the student agrees to pay all

required fees, maintain the prescribed level of academic

achievement, and observe the school's disciplinary regulations, in

return for which the school agrees to allow the student to pursue his

course of studies and be granted a diploma upon the successful

completion thereof. Since a formal contract is rarely prepared, the

general nature and terms of the agreement are usually implied, with

specific terms to be found in the university bulletin and other

publications. This contract has been upheld against attacks based

upon lack of consideration, the statute of frauds, and lack of mutuality

of obligation.

64. The Plaintiff argues he engaged in a written or oral contract with

defendants where the Plaintiff agreed to pay all required fees,

maintain the prescribed level of academic achievement, and observe

the school's disciplinary regulations, in return for which the school

agreed to allow the Plaintiff to pursue his course of studies and be granted a diploma upon the successful completion thereof.

65.  The Plaintiff was expelled from RWU in 2001 and to attend RWU within the compliance and dictates of the 2001-2002 Student Handbook were provisions that governed disciplinary hearings and notice of any student code violations.  See, (Pl's. First Am. Compl PP 10-28).

66.  RWU prepares and distributes to those who enroll a student handbook.  With respect to matters of student conduct, the handbook designates the rudimentary contractual terms between the parties vis-a-vis hearings and the appeal process.  In pertinent part, it gives a student a right of appeal from the University's decision anent charges of violating the Code.  It specifies the bases on which a student may appeal, including the imposition of an inappropriate sanction.

67.  Once the student submits a letter stating the basis for his appeal, the appeal officer must engage in a "further review of the University's decision."  The handbook does not limn the procedures to be followed by the appeal officer.  It is likewise silent as to the kinds of materials that an appeal officer may review.

68.  The Plaintiff asseverates, however, that the University breached its contract because defendants were improperly influenced by the Plaintiff's conduct and getting rid of him without following RWU procedure by denying the Plaintiff a right to a fair hearing and opportunity to argue his side of the story or dispute any allegations.

69.  The Plaintiff alleges due to unresolved disputes he faced while living on the RWU campus including noise disturbances, alcohol, drugs, and partying that interfered with the Plaintiff being able to take full advantage of the academic community resulted him being expelled and removed from RWU.

70.  In the present case, RWU student handbook does indeed call for certain process surrounding discharges from the school for disciplinary reasons.  The Plaintiff argues that he should have been afforded an impartial hearing and other process before being expelled.  The record is replete with evidence to support the Plaintiff's assertions that he was denied an impartial hearing and other process before being expelled.  The student handbook does require a particular process for a student to be suspended, expelled, and or disciplined.  The Plaintiff resisted the suggestions of defendants implicating him in any wrongdoing which had forced the University to

take disciplinary action. Due the University's failure to follow the University's student Handbook he has a viable breach of contract claim. By Plaintiff's own admission, he sought to argue his side of the story and dispute any allegations by attempting to speak directly with co-defendant, President, Roy J. Nirschel as well as the other defendants. See, (Pl's. First Am. Compl. PP 10-28).

71. The Plaintiff further argues he spoke directly with co-defendant, Richard Stegman regarding University campus life and the issues with living on the University campus. Co-defendant, Richard Stegman told the Plaintiff if '[he] did not like it here he did not have to stay, [you] could leave. We do not have to tell your parents anything, you are an adult now and we cannot get rid of you anytime we feel.' The Plaintiff argued that he had paid to be here and felt that co-defendant, Richard Stegman was really sitting still while problems continued to exacerbate. See, (Pl's. First Am. Compl PP 21-23).

72. Moreover, the Plaintiff contends co-defendant, Allison Chase-Padula with the support of co-defendants, Richard Stegman and Heidi Hartzell were able to facilitate the removal and expulsion of the Plaintiff from RWU. The Plaintiff was being pacified by co-defendant, Allison Chase-Padula as to his complaints he made against RWU.