**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

JOSHUA BARRETT SHAPIRO,
                 Plaintiff

      v.                             C.A. No. 011-140-ML

ROGER WILLIAMS UNIVERSITY, et al,
                 Defendants

### MEMORANDUM AND ORDER

The plaintiff in this case, Joshua Barrett Shapiro ("Shapiro") is a former student of Roger Williams University ("RWU"). Shapiro has brought claims of (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, (3) fraud, (4) deceit, (5) negligent misrepresentation, and for (6) punitive damages against RWU, as well as several former and current RWU employees in their official and individual capacity (the "individually named Defendants," together with RWU, the "Defendants"). The matter is before the Court on the individually named Defendants' motion for summary judgment.

### I. Factual Background

Shapiro attended RWU from the 1999 summer term until October 10, 2001. During that time, Shapiro lived in the campus dormitories. According to the Defendants, Shapiro displayed persistent behavioral issues during that time. Defendants' Statement of Undisputed Facts ("DSUF") ¶ 4 (Docket # 44). Shapiro denies that assertion and states that he "experienced quite a

1

number of incidents with other students which created tension on the RWU campus." Plaintiff's Statement of Disputed Facts ("PSDF") ¶ 4 (Docket # 47). During the time Shapiro attended RWU, the individually named Defendants were employed by RWU in various capacities: Allison Chase-Padula ("Chase-Padula") was Associate Dean of Student Affairs; Heidi Hartzell ("Hartzell") was Director of Student Conduct and Community Standards; Tony Montefusco ("Montefusco") was Director of Housing; Roy J. Nirschel ("Nirschel") was President of RWU; Richard Stegman ("Stegman") was Dean of Student Affairs; and Anthony Pesare ("Pesare") was head of the Criminal Justice Department and Shapiro's Academic Advisor. DSUF ¶ 6-11. While Shapiro agrees that the individually named Defendants were employed by RWU and were "acting on behalf of [RWU]," he disputes that they were "agents" of RWU during the relevant time frame. PSDF ¶ 5.

According to the Complaint, Shapiro was "expelled" from RWU in the beginning of the 2001 fall term while he was enrolled in the Criminal Justice program under the supervision of Pesare. Complaint ¶¶ 3, 13. Shapiro states that, pursuant to the RWU student handbook he received - as do all students attending RWU - a student charged with a violation of the University code "will receive notice with an explanation of the incident and an explanation of the specific charge statement." Id. ¶ 25. Shapiro alleges that he "never received an explanation of any incident or

explanation of the specific charge statement or any opportunity to voice his side of the story." Id. ¶ 26.  Shapiro states that each student "is entitled to a Disciplinary Meeting where the student will be encouraged to discuss and review the charges brought against him or her," id. ¶ 27.  He also asserts that (1) the student may choose to admit the charges and have the situation resolved through an Administrative meeting; (2) the student may deny the charges and request review of the case by an administrative hearing officer (or complete an Administrative Meeting at that time); and that (3) if the outcome of the alleged violation could result in suspension or expulsion of the student from RWU, the Office of Student Conduct and Community Standards must provide written notice to the student and may give the student the option of having the case heard by the University Disciplinary Committee (UDC) or have a University Hearing (UH).   Id.   ¶27.  Shapiro notes, however, that "[a]t times the University may select not to give the student an option and send the case to either a UDC or UH.  The notification will be given at least two calendar days prior to the hearing." Id.  Moreover, "in a case of alleged violation of the Conduct Code, the Vice President of Student Affairs . . . may remove a case from the University's conduct system" and "have the sole and unreviewable discretion to conduct hearings, if any, upon notice, and impose such sanctions deemed appropriate." Id.

3

According to Shapiro, the Defendants "failed to ensure [he] received a formal hearing, notice/parental notice[1] of any code violations, complaint, or documentation concerning his expulsion from RWU" and that he "was precluded from asserting his right to appeal any decision of RWU that he may have been dissatisfied about." Id. ¶ 28.  Shapiro also sets forth a litany of complaints against the individually named Defendants and claims that "each defendant personally participated and contributed to [his] removal from RWU." Id. ¶ 16.

In responding to Shapiro's objection to their motion for summary judgment, the individually named Defendants have submitted a series of letters from RWU (primarily, the Office of Judicial Affairs) related to the events that occurred during the 2001 fall semester.[2]   From those communications, it appears that, on September 21, 2001, Chase-Padula first informed Shapiro that he was charged with violating the RWU Conduct Code and that a disciplinary meeting was scheduled for September 25, 2001. (Ex. A).  Chase-Padula also advised Shapiro that, if he failed to appear, she would

---

[1]

Shapiro states that, while he attended RWU, he was financially dependent on his parents and that, pursuant to the student handbook, RWU was required to notify his parents in the event of any code violations.   Id. ¶ 29.

[2]

Because those communications are part of Shapiro's confidential student records, the Defendants filed them under seal. Shapiro then filed a motion to unseal the letters (Docket # 55), which has since been granted (Docket # 73).

render a decision in his absence.   The letter contains a handwritten note, stating "failed to pick up or be available - reschedule." Id.

On September 27, 2001, Chase-Padula sent another letter to Shapiro, informing him of a newly alleged violation of the RWU Conduct Code, for which she scheduled a disciplinary meeting on September 28, 2001.  Ex. C.  Attached to this communication is a verification form signed by Shapiro and Chase-Padula, confirming that "two judicial letters" were hand delivered to Shapiro. Ex. D.

On September 28, 2001, Chase-Padula sent a further letter to Shapiro, informing him of yet another alleged violation of the RWU Conduct Code, which would also be discussed at the scheduled meeting. Ex. E.

On September 28, 2001, Hartzell informed Shapiro by letter that he had been charged with various violations of the Conduct Code; she noted that, during the September 28, 2001 meeting, he had requested an Administrative Hearing; and she advised Shapiro that such a hearing would be conducted on Monday, October 1, 2001. Hartzell enclosed a copy of the Administrative Hearing Agenda as well as an optional Student Response Form for Shapiro to complete, which would be reviewed by the Hearing Officer.  Hartzell also explained that Shapiro was permitted to call witnesses and present documentation at that hearing.  Ex. F. As with all prior letters, Shapiro signed a form confirming receipt of this communication.

Ex. G.

On October 2, 2001, Hartzell notified Shapiro that, following the Administrative Hearing held on October 1, 2001, the Hearing Officer recommended that, "in light of the seriousness of the issues at hand, a higher hearing body hear [Shapiro's] case." Ex. H. After describing the charges asserted against Shapiro, Hartzell explained that "[t]he Office of Judicial Affairs has determined that these allegations of misconduct are subject to review by a University Hearing," which deals with cases that could result in suspension or expulsion. Id. Hartzell referred Shapiro to the applicable provision in the Student handbook and advised him that he was permitted to be accompanied by an advisor, to present witnesses, and to submit documentation. Hartzell also included another optional Student Response Form. Id.

On October 10, 2001, Chase-Padula, who functioned as the hearing officer for Shapiro's judicial review, informed Shapiro that he was sanctioned "to immediate suspension from the University through May 25, 2002." Ex. J. Chase-Padula stated that, with respect to seven separate incidents resulting in code violations, Shapiro had pled "in violation" to two of the charges and "not in violation" to the remaining charges. Id. Based on the information presented, Shapiro's testimony, and the testimony of the witnesses, she found him in violation of all charges. Id. Chase-Padula also explained that she sanctioned Shapiro through the end of the spring

6

semester, "so as to allow you the opportunity to return to the University if you choose during the summer term when it might be easier for you to reacclimate yourself." Id.   Further, Chase-Padula explained the details of Shapiro's suspension and advised him of certain conditions to his return to RWU.  Chase-Padula noted that she or Hartzell would place a call to Shapiro's parents to inform them of the sanction.  Finally, Chase-Padula advised Shapiro that, pursuant to the RWU student handbook, he had a right to appeal her decision, and she described the process in some detail. Id.

In a letter dated October 12, 2001, Shapiro requested "an appeal of my recent suspension from [RWU]." Ex. L.  Receipt of Shapiro's request was confirmed via fax signed by both Chase-Padula and Hartzell.  Ex. O.  By letter dated October 12, 2001, Dean of Student Affairs Stegman informed Shapiro that, after a thorough review of Shapiro's letter and other pertinent documents, he found no compelling reasons to grant Shapiro's appeal. Ex. M.  As a result, the sanctions imposed on Shapiro remained in effect.  Id.

## II. Procedural History

On April 5, 2011, nearly a decade after the events leading to this litigation, Shapiro filed a six-count complaint against RWU and the individually named Defendants. (Docket # 1).  On May 9, 2011, he filed a 188 paragraph amended complaint (the "First Amended Complaint")(Docket # 5). Shapiro alleged, inter alia, that

7

he was a "victim of travesty of justice, deliberate injustice knowingly committed" by the individually named Defendants and "such gross injustice was committed with wanton, malice and fraud, all of which will pierce the University veil and hold defendants accountable as any other citizen who violated the law of the land." First Amended Complaint at 1-2. Shapiro characterized actions by former RWU President Roy R. Nirschel ("Nirschel") as a "University dictatorship and University tyranny." Id. at 2. Shapiro claimed that, in violation of provisions in the RWU Student Handbook governing disciplinary hearings and notice of student code violations, he was "expelled" from RWU in the beginning of the 2001 fall semester "without proper notice or hearing." Id. at 7. In connection with this alleged expulsion, Shapiro stated that, because he was financially dependent on his parents while he was a student, RWU was obligated, but failed, to appropriately notify Shapiro's parents about allegations of code violations and/or administrative hearings involving Shapiro. Id. at 47. Shapiro further stated that he twice requested, and was denied, "information from RWU concerning why he was expelled." Id. at 11. Finally, Shapiro asserted that he incurred $30,000 in debt[3] for the 2001 fall semester and that he received no reimbursement for a prepaid meal plan after he was "expelled." Id. at 46.

---

[3]

Shapiro also asserted, however, that he discharged such debt in Chapter 7 bankruptcy proceedings. Id. at 46.

Shapiro seeks compensatory and punitive damages in the amount of $2,500,000, prospective injunctive relief, declaratory judgment, and costs of the suit. First Amended Complaint at 73. In addition, Shapiro seeks to expunge the record of "his entire third year . . . including any internal disciplinary action or academic disqualification." Id. at 72.

On July 7, 2011, the Defendants filed an answer to the First Amended Complaint, generally denying all of Shapiro's allegations and asserting nineteen separate affirmative defenses, including insufficiency of service of process. Answer Page 12 of 14 (Docket # 10). In later pleadings, the Defendants maintained that Shapiro was not expelled from RWU, but that, after asserting disciplinary charges against him, RWU decided to suspend Shapiro and explicitly informed him what actions he would have to take in order to return. Shapiro's appeal of that decision was denied. (Docket # 35).

On July 27, 2011, Shapiro filed a motion to strike nine of Defendants' affirmative defenses on the ground that they were without merit or basis in fact or law. (Docket # 13). Defendants objected, (Docket #15), and the motion was denied with the exception of the affirmative defense of failure to exhaust administrative remedies, which RWU agreed to waive. (Docket # 19).

On September 6, 2011, Shapiro filed a motion to re-attempt service of summons and First Amended Complaint on Nirschel who had moved to Vietnam in 2010. (Docket # 17). In a supplemental

9

memorandum filed on October 11, 2011, Shapiro explained that he asked the Court "to appoint a U.S. Marshal[] to travel to Vietnam" to serve Nirschel. (Docket #24).  Shapiro's motion was denied on October 18, 2011, and the Court suggested that Shapiro attempt service by mail. (Docket # 25).  Nirschel was subsequently served and filed an answer on November 3, 2011 (Docket #30).

On October 20, 2011, RWU sought a protective order with respect to certain student records requested by Shapiro which contained identifying information of other students who had interacted with Shapiro (Docket # 27).   The motion was granted (Text Order 11/10/11).

On December 19, 2011, Shapiro filed a lengthy motion seeking reconsideration of (1) the Court's determination regarding RWU's affirmative defenses, (2) the protective order, and (3) unspecified relief regarding Nirschel's answer. (Docket #31).  Shapiro's motion was based, in part, on the fact that the Defendants had made their filings electronically and had not mailed a copy to Shapiro.[4] Shapiro's motion was denied with respect to Items (1) and (3), and granted with respect to Item (2).   The Magistrate Judge also directed defense counsel to submit a proposed confidentiality order, pursuant to which Shapiro would be provided with his

---

[4]

   Shapiro, who is *pro se*, repeatedly notes in his filings that his father is an attorney and that Shapiro himself has sought admission to law school.

educational records, subject to such an order. (Docket #38 at 3
n.5). Relatedly, the Defendants' motion to seal certain documents
in Shapiro's student file was granted. (Docket ## 36, 37).

On December 19, 2011, Shapiro filed a 51-page motion to compel
discovery from the Defendants related to the individually named
Defendants' financial conditions and status of employment, which he
sought in order to prove punitive damages. (Docket # 32).  Shapiro
also filed an objection to Defendants' interrogatories directed at
him (Docket # 33).   Shapiro's motion to compel was denied on
January 10, 2012 on the Court's determination that, with respect to
the individually named Defendants, Shapiro had "failed to allege
facts  sufficient  to   make a claim for punitive damages and
sufficient to show that the claim is not spurious." (Docket # 39).

On January 30, 2012, the individually named Defendants filed
a motion for summary judgment as to all counts against them on the
ground that the actions asserted against them were performed as
agents and/or employees of RWU acting within the scope of their
authority. (Docket # 43). Shapiro filed an objection on February
14, 2012, arguing that (1) the documents under seal, to which the
Defendants refer in their motion, have not been properly
authenticated; (2) the motion is premature because of insufficient
discovery; (3) the Court failed to provide certain orders and
Defendants' filings to him. (Docket #46). Shapiro also complains
that Defendants "continue to not send or properly serve pleadings,

motions, memorandums, and other documents," <u>id.</u> at 10, and he asserts that their "failure to meet and confer regarding its proposed Motion for Protective Order demonstrates defendants' lack of commitment in resolving this case." <u>Id.</u> at 9.  With respect to the individually named Defendants' position, that they performed their actions as agents or employees of RWU, Shapiro argues (at least in some portion of his memorandum) that "Defendants acted outside of their authority by contravening the terms and conditions of the RWU student handbook and committing fraud, deceit, and negligent misrepresentation as averred, *supra*." <u>Id.</u> at 21.

On February 24, 2012, the Defendants filed a motion to seal documents which are part of Shapiro's confidential student file (Docket # 50), which motion was granted by this Court (Docket #51). Since then, Shapiro has filed a motion to unseal the documents on the grounds that the Defendants' motion "does not indicate in what way these documents are confidential and fails to provide a good faith basis for the requested sealed filings." (Docket # 55 at 2). Following a hearing on Shapiro's motion on April 16, 2012, the motion was granted on April 17, 2012.  (Docket # 73).

### III. Standard of Review

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure.  The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).  Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011).

An issue is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." Id. (quoting McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)).  A fact is material if it "might affect the outcome of the suit, under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 102 (1986).  To determine whether a genuine dispute as to any material fact exists, the Court considers the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  Markel American Ins. Co. v. Diaz-Santiago, — F.3d —, 2012 WL 883617, *8 (1st Cir. March 16, 2012).

Where "the nonmovant bears the burden of proof on the dispositive issue, it must point to 'competent evidence' and 'specific facts' to stave off summary judgment." Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d at 56 (citation omitted).  However, "[u]nsupported allegations and speculation do not demonstrate either entitlement to summary judgment or the existence of a genuine issue of material fact sufficient to defeat summary judgment." Rivera-Colon v. Mills, 635 F.3d 9, 12 (1st Cir. 2011).

13

## IV. Discussion

It is well established law in Rhode Island that "'an agent acting on behalf of a disclosed principal is not personally liable to a third party for acts performed within the scope of his authority.'" Alterio v. Biltmore Constr. Corp., 119 R.I. 307, 315, 377 A.2d 237, 241 (1977)(quoting Cardente v. Maggiacomo Ins. Agency, Inc., 108 R.I. 71, 73, 272 A.2d 155, 156 (1971). Within three days of issuing Cardente, the Rhode Island Supreme Court clarified that an agent was excused from liability only when (1) acting solely on behalf of a disclosed principal, (2) acting within the scope of her duties, and (3) she had not undertaken any other obligation independent of her relationship with the principal. C.C. Plumb Mixes, Inc. v. Stone, 108 R.I. 75, 76, 272 A.2d 152, 154 (1971).  See Stebbins v. Wells, 818 A.2d 711, 719 (R.I. 2003)(exceptions to rule include challenged acts of agent that are (1) outside the scope of the agency, (2) to be performed under contract with the seller, and (3) not within the scope of a disclosure duty independent of the agency relationship.)

Although Shapiro flatly denies that the individually named Defendants were agents of RWU, see PSDF ¶ 5, such denial is unsupported by any facts.  It is undisputed that these individual Defendants were employed by RWU during the time at issue, and there is nothing to indicate that they acted outside of their scope of authority or that they had any independent obligations toward

14

Shapiro.

Shapiro's allegations against Nirschel include that Nirschel "acted personally" in having Shapiro removed from RWU.   Amended Complaint ¶ 5.   However, in other parts of the 73-page First Amended Complaint, Shapiro accuses Nirschel of "University dictatorship and University tyranny" and states that Nirschel has "acted in a manner [of] conduct unbecoming a University officer." Id. ¶ 166.

With respect to Stegman, Shapiro asserts that Stegman executed the order to have Shapiro "expelled" without affording him a hearing or fair notice.   Id. ¶ 5.   Although Shapiro alleges that Stegman "acted out of personal motivation and has used his Student Affairs office as an offensive weapon to vindicate personal objectives," id. ¶ 6, nothing in the Amended Complaint or in any other filings indicates that Stegman ever acted outside his official capacity as an RWU employee.

Likewise, Shapiro accuses Hartzell of refusing to consider his side of the story, id. ¶ 7, while, at the same time, he alleges that Hartzell was "provided with the authority to remove [Shapiro] from RWU" by Stegman.   Id. ¶ 38.

Further, Shapiro alleges that Chase-Padula, in her position as "Associate Dean," "assumed the authority and power to act as a 'Dean' in making decisions."   Id. ¶ 8.   According to Shapiro, Chase-Padula made no efforts to resolve Shapiro's complaints and

"instead stood behind the decisions of her superiors." Id. ¶ 40. Shapiro also alleges that Chase-Padula "assumed the responsibilities and duties that were ordinarily executed or performed by . . . Stegman." Id. ¶ 41.

Regarding Montefusco, Shapiro states that Montefusco was responsible for, but failed in, overseeing the housing contract Shapiro had with RWU. Id. ¶ 153. Specifically, Shapiro charges that he did not receive any notice or charge statement from Montefusco regarding Shapiro's termination from RWU student housing. Id. ¶ 36.

Finally, regarding Pesare, Shapiro states that, when he complained to Pesare about "his ongoing problems with RWU campus life concerning his dormitory situation . . . which interfered with [his] education experience as well as his overall living experience," Pesare "was neither amicable or congenial with [Shapiro} when he complained." Id. ¶ 10.

In essence, Shapiro appears to be accusing the individually named Defendants of participating in a vast conspiracy to expel him from RWU while disregarding the administrative procedures established for such a process. None of these unsupported allegations, however, bring the individually named Defendants' actions within a possible exception of the rule against personal liability of agents of a disclosed principal. Shapiro's assertion that he "shared a contractual relationship with each of the

16

Defendants," id. ¶ 63, is also entirely unsupported.   Therefore,

Shapiro's unsupported allegations that the individually named

Defendants acted in a personal capacity rather than within the

scope of authority they held as agents and employees of RWU are

insufficient to withstand the Defendants' motion for summary

judgment.

### Conclusion

For the reasons stated above, the motion for summary judgment

by the individually named Defendants with respect to personal

liability is GRANTED.


SO ORDERED.

/s/ Mary M. Lisi

Mary M. Lisi

Chief United States District Judge
April 30, 2012